UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ALBERT PADILLA,

                Plaintiff,

       -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION,

                Defendant.

**MEMORANDUM & ORDER**
**23-CV-8650 (NGG) (LB)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Albert Padilla brings this action against his employer, the New York City Department of Education (the "DOE"), for violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301-4335. (Complaint ("Compl.") (Dkt. 1).) Pending before the court is the DOE's motion to dismiss the Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6). (Motion to Dismiss ("Mot.") (Dkt. 17-3); Pl.'s Opposition ("Opp.") (Dkt. 17-6); Def.'s Reply ("Reply") (Dkt. 17-7).) For the reasons that follow, the DOE's motion to dismiss is GRANTED without prejudice to the filing of an amended complaint.

## I. BACKGROUND[1]

### A. First Deployment

In August 2004, the DOE hired Albert Padilla as a Substitute Vocational Teacher's Assistant at one of its schools. (*See* Compl. ¶ 11.) The DOE eventually promoted Padilla to Vocational Instructor, which position he holds to this day. (*Id.* ¶ 12.) Throughout

---

[1] The following facts are drawn from the Complaint and, for purposes of this motion to dismiss, are assumed to be true. *See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 349 (2d Cir. 2022).

his career with the DOE, Padilla has been enlisted in the United States Armed Forces ("the Army").[2] (*Id.* ¶¶ 13-14.)

On approximately July 18, 2016, the Army informed Padilla that he was being deployed for one year starting on January 5, 2017, with a required training in November 2016. (*Id.* ¶ 15.) Padilla submitted a request for Miliary Leave with the DOE. (*Id.* ¶ 16.) The DOE confirmed receipt of Padilla's request on October 6, 2016; however, it is unclear whether the DOE approved or denied his request. (*Id.*) Padilla also requested that he assume the same teaching assignment upon his return from deployment, although it is unclear whether Padilla made this request separately or as part of his request for Military Leave. (*Id.* ¶ 25.)

In November 2016, Padilla received a bill from a medical provider informing him that his DOE insurance plan did not apply to certain treatment. (*Id.* ¶ 17.) Upon further inspection, Padilla discovered that the DOE had cancelled his health benefits. (*Id.* ¶ 18.) Padilla notified Katherine Rodi[3] of this issue on December 4, 2016, and Rodi explained that Padilla was ineligible for benefits during pre-deployment training, but that he would receive pay and benefits throughout his actual deployment. (*Id.* ¶¶ 19-20.) Carla Torres, the school's payroll secretary, confirmed the same in January 2017. (*Id.* ¶ 23.) After speaking with Rodi in December 2016, Padilla contacted the Employer Support of the Guard and Reserve ("ESGR") to initiate a USERRA-based claim; however, he ultimately abandoned the issue and reported for his deployment. (*Id.* ¶¶ 21-22.)

Upon his return from deployment in December 2017, Padilla "met with supervision at [the DOE] to discuss his reinstatement

---

[2] Although it is unclear from the Complaint, which ought to specify such information, the court assumes that Padilla is enlisted in the United States Army Reserve.

[3] The Complaint does not explain who Katherine Rodi is, or her relation to Padilla or the DOE.

to his pre-deployment position for the spring 2018 term, which was confirmed at that meeting." (*Id.* ¶ 26.) When Padilla returned to work on January 29, 2018, however, he recognized "a discrepancy" regarding his teaching assignment and brought it to his supervisor's attention. (*Id.* ¶ 27.) Later that day, Padilla filed a formal grievance. (*Id.* ¶ 28.) According to the Complaint, all of the issues stemming from Padilla's first deployment—the pay and benefits issue, the teaching assignment issue, and an allegation of insubordination on the part of Padilla—were thereafter "seemingly resolved." (*Id.* ¶ 29.) Padilla continued his employment with the DOE from 2018 to 2022. (*Id.*)

### B. Second Deployment

In January 2022, Padilla received new deployment orders and submitted a request for Military Leave from January 16, 2022, to April 1, 2022. (Compl. ¶ 30.) On March 22, 2022, the DOE approved Padilla for paid leave during this period. (*Id.* ¶ 32.)

The following day, Padilla submitted a request to extend his paid leave through June 30, 2022, so that he could undergo "major [spinal] surgery required after his deployment." (*Id.* ¶¶ 33, 52.) Initially, the DOE approved Padilla's request through June 28, 2022, using Cumulative Absence Reserve days ("CAR days"), which apparently allowed Padilla to be paid for that time off. (*Id.* ¶¶ 33-34.) However, upon additional medical review, the DOE extended Padilla's leave to June 30, 2022, designating it as "leave without pay, denying [his] use of CAR days without explanation." (*Id.* ¶ 34.) Although he complained about the denial of pay to Dermot Smyth, Mejia Ibeth, LeRoy Barr, and Amy Arundell,[4] Padilla was ultimately "unable to use CAR days[,] and his leave request was approved as unpaid." (*Id.* ¶¶ 35-38.)

---

[4] The Complaint does not explain who these individuals are, or their relation to Padilla or the DOE.

Padilla contends that someone—the Complaint does not specify who—instructed him to apply for a six-month health sabbatical, which would include leave with pay, to allow him adequate time to recover from surgery. (*Id.* ¶¶ 35-36, 39.) Specifically, approximately three weeks after his surgery, Padilla's doctor, Dr. Thomas Lee, confirmed that Padilla would require at least six months to recover. (*Id.* ¶ 39.) However, when Padilla had a medical checkup four months after his surgery, Dr. Lee suggested that Padilla's recovery could take up to one year and advised that Padilla's leave should extend to, at a minimum, October 20, 2022, or one full year from the date of his surgery, April 20, 2023. (*Id.* ¶¶ 40-41.)

On September 5, 2022, Padilla submitted another request for a health sabbatical from August 1, 2022, to January 31, 2023; however, his request was denied because he "did not meet required number of years of appointed service" to qualify for a health sabbatical. (*Id.* ¶¶ 42-43.) Subsequently, Padilla received an email from the principal of his school, Steven Jackson, explaining that he expected Padilla to report to work given that his health sabbatical was denied. (*Id.* ¶ 44.)

On September 13, 2022, the DOE reopened Padilla's health sabbatical request and ultimately approved his application for a six-month period ending on January 31, 2023. (*Id.* ¶¶ 45, 47.) On January 27, 2023, Padilla submitted a request to extend his health sabbatical from February 1, 2023, to July 31, 2023; however, the DOE again denied his application on the ground that Padilla failed to meet the requisite years of appointed service to qualify for a health sabbatical. (*Id.* ¶¶ 48-49.) Thereafter, Padilla amended his request and asked that his leave end on April 21, 2023, one year after his surgery, which the DOE ultimately approved without pay. (*Id.* ¶¶ 49, 51.) When Padilla contacted Ms. Arundell regarding his frustrations, she "provided [Padilla] with

three options he could utilize, of which he chose the option that exhausted all his sick time." (*Id.* ¶¶ 52-53.)

On April 10, 2023, Padilla received four notices regarding his leave requests: (1) a "partial approval for his request for health sabbatical from April 4, 2022, through July 31, 2022, stating that leave would be denied from June 29, 2022, through July 31, 2022, indicating that CAR days would apply"; (2) a partial approval of Padilla's request for a health sabbatical from August 1, 2022 to January 31, 2023, "stating that his request was approved from September 6, 2022, through April 21, 2023, but denied from August 1, 2022, to September 5, 2022, and later yet another approval indicating that CAR days would also apply to this request"; (3) an approval of his "restoration of health leave request," approving Padilla for leave without pay "from February 1, 2023, to February 1, 2023"[5]; and (4) an approval of Padilla's request for restoration of his health sabbatical from April 2, 2023, to June 30, 2023, using CAR days. (*Id.* ¶¶ 54-57.)

On April 20, 2023, "while his wife was pregnant," Padilla's health insurance companies notified him that his coverage would terminate on April 22, 2023. (*Id.* ¶ 58.) Padilla contacted Ms. Arundell regarding this information, and she explained that "she had already told the Leaves Department of [Padilla's] intent to extend his leave and, consequently, his health insurance through July 31, 2023." (*Id.*) On May 5, 2023, the DOE approved Padilla's health leave extension through June 30, 2023. (*Id.* ¶¶ 58-59.) Upon request for additional documents regarding his diagnosis and prognosis, the DOE approved Padilla's request for a health sabbatical through July 31, 2023. (*Id.* ¶ 60.)

On May 26, 2023, the school's payroll secretary informed Padilla that the DOE's internal system indicated he was on leave without

---

[5] The court presumes that this short date range is the result of a typo in the Complaint.

pay. (*Id.* ¶ 61.) Padilla responded, informing her that his health benefits "had also not been corrected and had been suspended since February 2023." (*Id.*) To date, Padilla alleges that his "health benefits and pay have not been reinstated and have caused significant financial hardship, stress, and emotional disruption for him and his family." (*Id.* ¶ 64.)

### C.   Procedural History

Padilla filed the instant Complaint on November 21, 2023, alleging that the DOE failed to reinstate his former teaching assignment and wrongfully withheld his pay and benefits in violation of USERRA, specifically 38 U.S.C. §§ 4311(a)-(c) and 4312(a), (b). (Compl. ¶¶ 69-77.) Padilla seeks damages, attorneys' fees, and interest. (*Id.* ¶¶ 76-77.)

The Complaint's "Jurisdiction" section does not cite any jurisdictional statute nor explicitly state the basis for the court's jurisdiction. (*Id.* ¶¶ 1-2.) Rather, it simply states that "[t]his is an action seeking equitable and legal relief for violation of the Uniformed Services Employment and Reemployment Rights Act, United States Code, Title 38, Ch. 43 *et seq.*" (*Id.* ¶ 1.) While the court questions whether this statement satisfies the requirements of Rule 8(a), *see* Fed. R. Civ. P. 8(a)(1), the civil cover sheet demonstrates that Padilla intends to invoke the court's federal question jurisdiction under 28 U.S.C. § 1331. (Civil Cover Sheet (Dkt. 1-1) at 1.)

On October 25, 2024, the court granted the DOE's request to file a motion to dismiss the Complaint. (Min. Entry Dated 10/25/2024.) On December 18, 2024, the DOE filed its fully briefed motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Mot.)

On February 5, 2025, the court directed the parties to submit supplemental briefing addressing the issue of the court's subject-matter jurisdiction over this action. (Text Order Dated

2/5/2025.) The DOE and Padilla submitted their supplemental briefs on February 6 and March 5, respectively, in which they agreed that USERRA's jurisdictional section—38 U.S.C. § 4323(b)—grants the court subject-matter jurisdiction over this action. (DOE SMJ Br. (Dkt. 18); Padilla SMJ Br. (Dkt. 19).)

## II. LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).[6] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint must contain facts that do more than present a "sheer possibility that a defendant has acted unlawfully." *Id.* In deciding a motion to dismiss, the court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *See Fink v. Time Warner Cable,* 714 F.3d 739, 740-41 (2d Cir. 2013). However, allegations that "are no more than conclusions [ ] are not entitled to the assumption of truth." *Hayden v. Paterson,* 594 F.3d 150, 161 (2d Cir. 2010). Dismissal for failure to state a claim is appropriate if it is clear from the face of the complaint that a claim is barred as a matter of law. *Biocad JSC v. F. Hoffmann-La Roche,* 942 F.3d 88, 93 (2d Cir. 2019).

Additionally, a federal court has an independent obligation to assure itself of its own jurisdiction. *Arnold v. Lucks,* 392 F.3d 512, 517 (2d Cir. 2004). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *Oscar Gruss & Son, Inc. v.*

---

[6] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

*Hollander*, 337 F.3d 186, 193 (2d Cir. 2003) ("Failure of subject matter jurisdiction . . . may be raised at any time by a party or by the court *sua sponte*."). Federal subject-matter jurisdiction is present only when a "civil action[] aris[es] under the Constitution, laws, or treaties of the United States," *see* 28 U.S.C. § 1331, or when the parties are completely diverse and the amount in controversy exceeds $75,000, *see* 28 U.S.C. § 1332. "[W]hen federal law creates a private right of action and furnishes the substantive rules of decision, the claim arises under federal law, and district courts possess federal-question jurisdiction under § 1331." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 378-79 (2012). That principle applies "unless Congress divests federal courts of their § 1331 adjudicatory authority." *Id.* at 379. Courts must generally consider jurisdictional questions first, before turning to the merits of a case. *United States ex rel. Hanks v. United States*, 961 F.3d 131, 137 (2d Cir. 2020) ("There are a few recognized exceptions to the otherwise solid rule that subject-matter jurisdiction must be decided first.").

## III. DISCUSSION

### A. Subject-Matter Jurisdiction

"Section 4323 of title 38 governs jurisdiction over claims brought under USERRA." *Cresci v. Mohawk Valley Cmty. Coll.*, 693 F. App'x 21, 23 (2d Cir. 2017) (summary order). Section 4323 provides, in pertinent part:

(b) Jurisdiction.—

(1) In the case of an action against a State (as an employer) or a private employer commenced by the United States, the district courts of the United States shall have jurisdiction over the action.

(2) In the case of an action against a State (as an employer) by a person, the action may be brought in a State court of

competent jurisdiction in accordance with the laws of the State.

(3) In the case of an action against a private employer by a person, the district courts of the United States shall have jurisdiction of the action.

38 U.S.C. § 4323(b). For purposes of Section 4323, "the term 'private employer' includes a political subdivision of a State." *Id.* § 4323(i). Additionally, USERRA defines a "State" as "each of the several States of the United States . . . (including the agencies and political subdivisions thereof)." *Id.* § 4303(14).

Read together with the relevant definitions, Section 4323 provides that actions brought by persons against *States and state agencies* "may be litigated only in state courts," whereas actions brought by persons against *political subdivisions* of a State may be brought in state *or* federal court. *Cresci,* 693 F. App'x at 23; *see also Rivera v. Cnty. of Suffolk,* No. 21-CV-5439 (GRB), 2023 WL 2403616, at *2 (E.D.N.Y. Mar. 8, 2023) (holding that the federal court had subject-matter jurisdiction over suit by individual against Suffolk County, a political subdivision of New York State). In this case, the question is whether the DOE is a "state agency" or "political subdivision" for purposes of USERRA. If it is a state agency, then the court lacks subject-matter jurisdiction pursuant to Section 4323(b)(2). If it is a political subdivision, then the court has subject-matter jurisdiction pursuant to Sections 4323(b)(3) and (i).

The parties agree that the DOE is a "political subdivision" of New York State, making it a "private employer" for purposes of Section 4323. (DOE SMJ Br.; Padilla SMJ Br.) The DOE relies on three categories of cases to support its position: (1) USERRA cases featuring the DOE as a defendant which were litigated by a federal court on the merits but did not address the issue of jurisdiction; (2) USERRA cases that did not feature the DOE as a defendant but did address the issue of jurisdiction; and (3) cases

where federal courts determined, in different statutory contexts, that the DOE is a political subdivision of New York State. (DOE SMJ Br. at 2-3.) Padilla's submission cites no caselaw or statutory authority; it simply agrees with the DOE's submission. (Padilla SMJ Br. at 1-2.)

With regard to the USERRA cases featuring the DOE as a defendant, while each of those cases reached the merits, none actually addressed the issue of jurisdiction. *See Dilfanian v. N.Y.C. Dep't of Educ.*, 700 F. App'x 5, 6-9 (2d Cir. 2017) (summary order) (addressing merits of case; no mention of jurisdiction); *Hunt v. Klein*, 476 F. App'x 889, 890-92 (2d Cir. 2012) (summary order) (same); *Byfield v. N.Y.C. Dep't of Educ.*, No. 22-CV-5869 (KPF), 2023 WL 8435183, at *7-8 (S.D.N.Y. Dec. 5, 2023) (same). "[W]hen questions of jurisdiction have been passed on in prior decisions sub silentio," the court is not bound by those decisions "when a subsequent case finally brings the jurisdictional issue [to the forefront]." *Hagans v. Lavine*, 415 U.S. 528, 533 n.5 (1974); *Idaho Potato Comm'n v. M & M Produce Farm & Sales*, 335 F.3d 130, 137 n.7 (2d Cir. 2003) ("We are not at all sure that a prior decision . . . in another case can create binding precedent for us on [an] issue when that decision does not mention the issue or the underlying facts."). In such circumstances, the court may approach the jurisdictional question "as an open one[,] calling for a canvass of the relevant jurisdictional considerations." *Hagans*, 415 U.S. at 533 n.5. Thus, because these cases do not address the jurisdictional issue, they provide little guidance to the court on this issue.

With regard to the USERRA cases featuring entities other than the DOE, those cases contain no reasoning as to why the particular entity qualified as a state agency or political subdivision. *Cresci*, 693 F. App'x at 23 (noting, without reasoning or explanation, that the Mohawk Valley Community College is a "state

agency"); *Rivera*, 2023 WL 2403616, at *2 (citing a Seventh Circuit case holding that Chicago is a "political subdivision" of Illinois and likewise concluding that Suffolk County is a "political subdivision" of New York State);[7] *see also Oliver v. N.Y. State Police*, No. 19-CV-233 (BKS) (DJS), 2020 WL 1849484, at *6 n.7 (N.D.N.Y. Apr. 13, 2020) (noting, without reasoning or explanation, that the New York State Police is a "state agency"). The DOE is not exactly akin to a city or county within a state, or to a state police agency. Nor is it clear how the court might analogize the DOE to any of these entities when the decisions classifying those entities as state agencies or political subdivisions provide no reasoning on the subject. *See Cresci*, 693 F. App'x at 23. Consequently, these cases are also unhelpful.

Finally, with regard to the cases where courts characterized the DOE as a "political subdivision" in other statutory contexts, to the extent those cases bear any relevance outside their respective statutory contexts, they contain no reasoning or explanation that the court might apply here. *Rubin v. N.Y.C. Bd. of Educ.*, No 20-CV-10208 (LGS) (KHP), 2023 WL 1972729, at *21 (S.D.N.Y. Jan. 6, 2023) (noting that, in New York Labor Law context, it is "well established that the DOE is a 'political subdivision' of New York State"), *report and recommendation adopted*, 2023 WL 2344731 (S.D.N.Y. Mar. 3, 2020); *see also Rollins v. N.Y.C. Dep't of Educ.*, Nos. 5-CV-10482 (LBS), 6-CV-3657 (LBS), 2008 WL 2736018, at *7 (S.D.N.Y. July 8, 2008) (holding, without any

---

[7] Further highlighting the confusion in this area of the law, a different Eastern District of New York decision determined that the federal court *lacked* subject-matter jurisdiction over Suffolk County. *Veronko v. Suffolk Cnty.*, 561 F. Supp. 3d 341, 342 (E.D.N.Y. 2021) ("Congress has directed that an employee of a State, or any agency or political subdivision of a State, may bring claims under USERRA to redress alleged grievances, but such cases may be litigated only in state courts."). *Veronko*, unlike *Rivera*, did not cite to Section 4323(i), which provides that "the term 'private employer' includes a political subdivision of a State." *Id.*; 38 U.S.C. § 4323(i). This omission might explain the different results.

11

reasoning or explanation, that in the Labor Management Relations Act context, the DOE "is a political subdivision of the State of New York"). As such, these cases provide little guidance in deciding this issue.

In sum, the court is faced with USERRA cases against the DOE that have *not* addressed the jurisdictional issue, USERRA cases against *other entities* that addressed the jurisdictional issue but contain no reasoning the court might map onto this scenario, and cases characterizing the DOE as a political subdivision in other statutory contexts, with no reasoning or explanation. In these circumstances, the court may approach the jurisdictional question "as an open one[,] calling for a canvass of the relevant jurisdictional considerations." *Hagans*, 415 U.S. at 533 n.5.

Statutory interpretation questions begin "with a careful examination of the ordinary meaning and structure of the law itself." *New York v. Nat'l Highway Traffic Safety Admin.* ("*NHTSA*"), 974 F.3d 87, 95 (2d Cir. 2020); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) ("[W]e begin with the understanding that Congress says in a statute what it means and means in a statute what it says there."). To assess "ordinary meaning," the court considers "the commonly understood meaning of the statute's words at the time Congress enacted [it], and with a view to their place in the overall statutory scheme." *NHTSA*, 974 F.3d at 95. "If the meaning is unambiguous, that is the end of [the] inquiry." *Id.* "If, however, the terms are ambiguous or unclear, [the court] may consider legislative history and other tools of statutory interpretation." *Nwozuzu v. Holder*, 726 F.3d 323, 327 (2d Cir. 2013).

The court begins with the "ordinary meaning" of USERRA's text. *NHTSA*, 974 F.3d at 95. As noted above, whether the court has subject-matter jurisdiction over this action depends on whether the DOE qualifies as a "state agency" or "political subdivision" of New York State. USERRA does not define either of these terms,

except as to classify state agencies and political subdivisions as
"States," and to simultaneously classify political subdivisions as
"private employers." *See* 38 U.S.C. §§ 4303(14), 4323(b) and (i).
Black's Law Dictionary defines a "government agency" as a "gov-
ernmental body with the authority to implement and administer
particular legislation." *Agency (3)*, Black's Law Dictionary (7th
ed. 1999).[8] And it defines a "political subdivision" as a "division
of a state that exists primarily to discharge some function of local
government." *Political Subdivision*, Black's Law Dictionary (7th
ed. 1999). Using the "commonly understood meaning[s]" of
these terms "at the time Congress enacted the statute," *NHTSA*,
974 F.3d at 95, the DOE appears more akin to a political subdi-
vision than it does to a state agency because it "exists primarily
to discharge some function of local government," *i.e.*, the admin-
istration of New York City schools. *See Political Subdivision*,
Black's Law Dictionary.

The history and structure of the DOE confirm the court's under-
standing. The New York State Legislature created the Board of
Education for the City of New York (the "BOE") in 1901 as a pub-
lic corporate entity separate and distinct from New York City,
with the purpose of managing New York City's public schools.
1901 N.Y. Laws pp. at 593-99 (Greater New York Charter of 1901
§§ 1055-1062); Bylaw 1.1, *Bylaws of the Panel for Educational
Policy of the City School District of the City of New York*, New York

---

[8] The 7th Edition of Black's Law Dictionary does not define the term "state
agency." *See generally* Black's Law Dictionary (7th ed. 1999). "Government
agency" is the closest analogy the court could find.

Additionally, the court refers to the 7th Edition of Black's Law Dictionary
because its publication year—1999—is the closest in time to the 1998
amendments to USERRA which adopted the version of Section 4323 at
issue in this case. *See generally* H.R. Rep. No. 105-448, at 5-6 (1998) (dis-
cussing relevant amendments to USERRA). By contrast, the 6th Edition of
Black's Law Dictionary was published in 1990. *See generally* Black's Law
Dictionary (6th ed. 1990).

City Department of Education (amended Sept. 25, 2024), https://www.schools.nyc.gov/get-involved/families/panel-for-education-policy/bylaws [https://perma.cc/BYP8-SPV4]. Prior to 2002, the BOE was a "semi-autonomous agency." *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 76 (2d Cir. 2011) (Straub, J., concurring in part). In 2002, legislative reforms transferred control of the BOE to the Mayor of New York City, stripping the BOE of its semi-autonomous agency status and creating a 13-member board consisting of the Chancellor, one member appointed by each of the five borough presidents, and seven members appointed by the Mayor. N.Y. Educ. L. § 2590-b(1)(a) (eff. July 1, 2002); *see also* Education—Reorganization of New York City School Construction Authority, Education and Community Boards, ch. 91, A. 11627 (2002). While the 2002 reforms made no specific reference to a "Department of Education," the bylaws subsequently adopted by the BOE provided that the BOE shall be "known as the Panel for Educational Policy,"[9] which, together with "the Chancellor, superintendents, community and citywide education councils, principals, and school leadership teams . . . shall be designated as the Department of Education of the City of New York." Bylaw 1.3, *Bylaws of the Panel for Educational Policy of the City School District of the City of New York*. Thus, the BOE created the DOE to serve as the "governance structure responsible for the City School District of the City of New York." *Id.* This is a quintessential "function of local government." *See Political Subdivision*, Black's Law Dictionary. As such, applying the ordinary meaning of the statute's terms and analyzing the history and structure of the DOE, the court

---

[9] Although it was rebranded as PEP, the BOE remains in existence. N.Y. Educ. L. § 2590-b(1)(a) ("The board of education of the city school district of the city of New York is hereby continued.").

concludes that the DOE is a political subdivision and thus a private employer subject to suit in federal court pursuant to Section 4323(b)(3).

While the above analysis ends the inquiry, *see NHTSA*, 974 F.3d at 95, it is worth mentioning that the legislative history of USERRA also supports the court's conclusion that the DOE is a political subdivision, rather than a state agency.

The legislative history of USERRA indicates that one issue preoccupied Congress in its drafting of Section 4323(b): state sovereign immunity. Originally, USERRA provided that a state could be sued in "any district in which the State exercises any authority or carries out any function," and a private employer could be sued in "any district in which the private employer . . . maintains a place of business." Pub. L. No. 103-353, 108 Stat. 3149, 3165 (1994) (original version of Section 4323(b)). However, following USERRA's enactment, several states and district courts took the position, based on *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996),[10] that the Eleventh Amendment completely barred private USERRA actions against states and state agencies. H.R. Rep. No. 105-448, at 3-5 (1998). Congress felt that this "threaten[ed] not only a long-standing policy protecting individuals' employment right, but also raise[d] serious questions about the United States['] ability to provide for a strong national defense." *Id.* at 5. So, based on its understanding of then-current Eleventh Amendment jurisprudence, Congress amended Section 4323(b) to limit private suits against states and state agencies to

---

[10] In *Seminole Tribe*, the Supreme Court held "that notwithstanding Congress' clear intent to abrogate the States' sovereign immunity, the Indian Commerce Clause does not grant Congress that power," and "[t]he Eleventh Amendment prohibits Congress from making the State of Florida capable of being sued in federal court" pursuant to 25 U.S.C. § 2710(d)(7). 517 U.S. at 47, 76.

state courts.[11] *Id.* at 5-6. Congress's concern with state sovereign immunity aligns with the idea that an entity like the DOE would be subject to suit in state *and* federal court, since "the Eleventh Amendment does not extend its immunity to units of local government." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 369 (2001); *Gorton v. Gettel*, 554 F.3d 60, 62 (2d Cir. 2009) ("[Eleventh Amendment] immunity does not extend to suits against municipal corporations or other governmental entities which are not arms of the State."). In other words, Congress did not think to cabin private suits against local entities like the DOE to state courts, because state sovereign immunity did not apply to those entities.

---

[11] Congress's understanding of state sovereign immunity turned out to be incorrect, at least in this context. In *Alden v. Maine,* the Supreme Court clarified that states are immune from private suit without their consent in both federal *and* state courts. 527 U.S. 706, 754 (1999) ("[W]e hold that the States retain immunity from private suit in their own courts."). But that immunity is subject to a notable exception: when the federal power pursuant to which Congress enacts a statute is "complete in itself, and the States consented to the exercise of that power—in its entirety—in the plan of the convention," then the States "implicitly agreed that their sovereignty would yield to that of the Federal Government." *Torres v. Tex. Dep't of Pub. Safety,* 597 U.S. 580, 589 (2022). In such circumstances, the States "simply have no immunity left to waive or abrogate." *Id.* In *Torres,* the Supreme Court held that USERRA fell within this exception because the States "waived their immunity under Congress' Article I power to raise and support Armies and provide and maintain a Navy"—the powers pursuant to which Congress enacted USERRA. *Id.* at 594. Thus, in the USERRA context, there is no state sovereign immunity to waive or abrogate. *Id.*

Importantly, *Torres* did not eliminate or invalidate Section 4323(b). *See id.* at 595 (recognizing that "USERRA suits [against states] must be brought in state (rather than federal) court"). Rather, it simply held that states and state agencies cannot claim sovereign immunity in private USERRA actions. Thus, while the sovereign immunity concerns undergirding Section 4323(b) are no longer relevant, the requirements of that section remain in effect.

In sum, the court concludes that, for purposes of USERRA, the DOE is a political subdivision of New York State, making it a private employer subject to suit in federal court. 38 U.S.C. §§ 4323(b)(3) and (i). Therefore, the court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

### B.   Rule 12(b)(6) Motion

Padilla's sole cause of action is for an alleged violation of USERRA Sections 4311(a)-(c) and 4312(a) and (b). (Compl. ¶¶ 69-77.) Padilla alleges that the DOE violated USERRA: (1) after his first deployment, when his "teaching assignment was not reinstated, nor was his return from deployment noted by [the DOE] with regard to his return to work"; and (2) when the DOE "continuously and repeatedly denied [Padilla] pay and benefits entitled to him by USERRA." (*Id.* ¶¶ 73-74.)

The DOE moves to dismiss the Complaint with prejudice on several grounds. First, the DOE argues that Padilla has conceded that all issues relating to his first deployment were resolved, and that his request for Military Leave for his second deployment was, in fact, approved. (Mot. at 8-9.) Second, the DOE adds that although Padilla claims that his requests for medical leave in connection with his surgery were only partially granted, Padilla does not allege that his surgery was actually connected to his military service. (*Id.* at 9.) Third and finally, even if Padilla's surgery were connected to his military service, the DOE argues that "discrimination based on a service-related disability, as opposed to military status, does not form a cause of action under USERRA." (*Id.*) Thus, the DOE requests that the court dismiss the Complaint with prejudice.

Padilla opposes the DOE's motion. First, Padilla argues that he properly linked his surgery to his military service when he alleged that he "request[ed] . . . restoration of health leave . . . due to a major surgery required after his deployment." (Opp. at 2 (quoting Compl. ¶¶ 33) (bolding omitted).) Second, Padilla contends

that he has adequately alleged discrimination on the basis of military service, not disability, pointing to four allegations in particular: (1) that the DOE cancelled his health benefits without proper authorization when he requested Military Leave in connection with his first deployment; (2) that the DOE instructed him to use his military benefits, not DOE benefits, during his training period; (3) that the DOE "failed to remedy this [benefits] issue even when [Padilla] engaged the assistance of his ESGR ombudsman"; and (4) that Padilla complained to Ms. Arundell regarding the hoops he was made to jump through "due to NYCDOE's inconsistencies and refusal to provide benefits due to his military service." (*Id.* at 3-4 (citing Compl. ¶¶ 18, 20-22, 52 (bolding omitted).) Padilla requests that the court deny the DOE's motion to dismiss, or, in the alternative, grant him leave to file an amended complaint. (Zeitz Affirmation (Dkt. 17-5) ¶¶ 7, 16.)

As noted above, Padilla alleges that the DOE violated USERRA: (1) after his first deployment, when his "teaching assignment was not reinstated, nor was his return from deployment noted by [the DOE] with regard to his return to work"; and (2) when the DOE "continuously and repeatedly denied [Padilla] pay and benefits entitled to him by USERRA." (Compl. ¶¶ 73-74.) With respect to the first alleged violation, as the DOE points out, Padilla admits that all issues pertaining to his first deployment were "resolved" and that that he "continued his employment with NYCDOE between 2018 and 2022," in his same, pre-deployment position. (*Id.* ¶ 29; Mot. at 8.) Thus, there appears to be no live controversy as to this alleged violation, and the court will not discuss it further because it is moot. *See Ferreira v. United States*, 354 F. Supp. 2d 406, 409 (S.D.N.Y. 2005) ("The mootness doctrine . . . requires that federal courts may not adjudicate matters that no longer present an actual dispute between parties."). As to the second alleged violation, Padilla claims that, "[t]o date, [he] has not been made whole from NYCDOE's wrongful denial of pay and

benefits." (Compl. ¶ 75.) This issue presents a live controversy, and the court will address the alleged violations of USERRA Sections 4311(a)-(c) and 4312(a) and (b) as to this issue in turn.

### 1. Section 4311(a)

USERRA Section 4311(a) is an antidiscrimination provision; it prohibits discrimination in "initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer" on the basis of a person's "membership [in a uniformed service], . . . performance of service, . . . or obligation." 38 U.S.C. § 4311(a); *see also Warren v. Int'l Bus. Machs. Corp.*, 358 F. Supp. 2d 301, 309-10 (S.D.N.Y. 2005) (explaining certain key provisions of USERRA). An employer violates Section 4311(a) if the person's service membership or obligation "is a motivating factor in the employer's action, *unless* the employer can prove that the action would have been taken in the absence of such membership, . . . or obligation for service." 38 U.S.C. § 4311(c)(1) (emphasis added).

Section 4311(a) claims "are evaluated using Title VII standards and case law." *Hughes v. City of New York*, No. 20-CV-3341 (AMD) (RLM), 2021 WL 7542440, at *6 (E.D.N.Y. Aug. 25, 2021). To survive a motion dismiss, "a plaintiff must allege sufficient facts to establish 'a prima facie case of discrimination by showing that his protected status was a substantial or motivating factor in the adverse employment action.'" *Hunt v. Klein*, No. 10-CV-2778 (GBD), 2011 WL 651876, at *3 (S.D.N.Y. Feb. 10, 2011) (quoting *Gummo v. Vill. of Depew*, 75 F.3d 98, 106 (2d Cir. 1996)), *aff'd*, 476 F. App'x 889 (2d Cir. 2012). "A motivating factor . . . is not necessarily the sole cause of the action, but rather it is one of the factors that a truthful employer would list if asked for the reasons for its decision." *Fink v. City of New York*, 129 F. Supp. 2d 511, 520 (E.D.N.Y. 2001). It is "something that the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Hunt*, 2011 WL 651876, at

19

*3. It "may be proven through direct or circumstantial evidence." *Woodard v. N.Y. Health & Hosps. Corp.*, 554 F. Supp. 2d 329, 348 (E.D.N.Y. 2008). Even if the plaintiff carries his initial burden, however, "the employer may nonetheless escape liability by showing . . . that it would have made the same decision without regard to the employee's protected status." *Gummo*, 75 F.3d at 106.

The court must determine whether the Complaint plausibly alleges that Padilla's status or conduct as a servicemember was a substantial or motivating factor in the DOE's "continuous[] and repeated[] . . . denial of pay and benefits." (Compl. ¶¶ 74-75.) The Complaint's allegations of discrimination are limited to three sentences. The first alleges that Padilla emailed Ms. Arundell with a "summary of the multiple denials, approvals, and hoops he was made to jump through while in the midst of recovery from an intensive spinal surgery due to the NYCDOE's inconsistencies and refusal to provide benefits due to his military service." (*Id.* ¶ 52.) The second alleges that Padilla "suffered and continues to suffer injuries and damages" as a "direct and proximate result of NYCDOE's disparate treatment, discrimination, retaliation, and/or hostile work environment harassment against Plaintiff, on the basis of his military status and/or military service." (*Id.* ¶ 65.) And the third alleges that "NYCDOE's disparate treatment, discrimination, retaliation, and/or hostile work environment harassment against Plaintiff, on the basis of his military status and/or military service, was malicious, willful, outrageous, and conducted with full knowledge of wrongdoing." (*Id.* ¶ 66.)

These allegations are no more than "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," which "do not suffice" to state a claim upon which relief can be granted. *Carlin v. Davidson Fink LLP*, 852 F.3d 207, 212 (2d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678). Padilla's Complaint describes various requests for and denials of pay and

benefits, and notes that these requests were related to a surgery required after his deployment. Nowhere does Padilla allege, in a non-conclusory fashion, that the DOE denied him pay or benefits *on the basis of his military service, status,* or *obligations.* The Complaint provides no direct or circumstantial evidence of a discriminatory motive; indeed, Padilla "never articulates a reason to conclude that any [] action taken against him was motivated by discriminatory animus."[12] *Hunt,* 2011 WL 651876, at *4. "Simply noting that he is a service member and asserting that various [] actions violated USERRA is insufficient." *Id.* And "[n]one of the many facts provided by [Padilla] regarding the circumstances that led to each [denial of pay and benefits], even when liberally construed and accepted as true, indicate that he was [denied pay and benefits] *because of his status or obligations as a military service member.*" *Id.* (emphasis added).

Moreover, even accepting that Padilla's surgery and the related complications were linked to his military service, "discrimination based on a service-related disability, as opposed to military status, does not form a cause of action under USERRA." *Rivera,* 2023 WL 2403616, at *2; *Hughes,* 2021 WL 7542440, at *6 (same); *see also Donley v. Vill. of Yorkville, N.Y.,* No. 14-CV-1324 (MAD) (ATB), 2019 WL 3817054, at *7 (N.D.N.Y. Aug. 13, 2019) (dismissing USERRA claim because "Plaintiff has not argued that he was discriminated against on the basis of his

---

[12] To the extent Padilla claims—for the first time in his opposition papers—that he "has provided counsel with emails and documentation directly citing his military service as the reason for [the denials of pay and benefits]," (*see* Zeitz Affirmation ¶ 14), it is well-settled that "a party is not entitled to amend [his] complaint through statements made in motion papers," *Soules v. Conn., Dep't of Emergency Servs. & Pub. Prot.,* 882 F.3d 52, 56 (2d Cir. 2018) (emphasis omitted). Even if the court were to consider this statement, it would not change the analysis, because it is another conclusory allegation bereft of any factual details. Padilla will have the opportunity to attach and/or describe these documents in his amended complaint; for now, they have no impact on the instant motion to dismiss.

military service, only that he was discriminated against on the basis of his service-related disability"). Thus, Padilla's "conclusory allegations that various employment actions taken against him violated USERRA [are] insufficient to state a claim" because he provides "no supporting facts upon which it could plausibly be inferred that his *military service* . . . was a substantial or motivating factor in the adverse employment actions." *Hunt v. Klein*, 476 F. App'x at 891 (emphasis added). The USERRA discrimination claim is dismissed.

### 2.    Section 4311(b)

USERRA Section 4311(b) is an anti-retaliation provision; it prohibits retaliation against an employee for, among other things, attempting to enforce their rights under USERRA. 38 U.S.C. § 4311(b). An employer violates Section 4311(b) if an action taken by the employee to enforce their rights under USERRA "is a motivating factor in the employer's action, *unless* the employer can prove that the action would have been taken in the absence of such person's enforcement action." 38 U.S.C. § 4311(c)(2) (emphasis added).

The Complaint's allegations of retaliation are limited to two sentences. The first alleges that Padilla "suffered and continues to suffer injuries and damages" as a "direct and proximate result of NYCDOE's disparate treatment, discrimination, retaliation, and/or hostile work environment harassment against Plaintiff, on the basis of his military status and/or military service." (Compl. ¶ 65.) And the second alleges that "NYCDOE's disparate treatment, discrimination, retaliation, and/or hostile work environment harassment against Plaintiff, on the basis of his military status and/or military service, was malicious, willful, outrageous, and conducted with full knowledge of wrongdoing." (*Id.* ¶ 66.) Neither party mentions retaliation anywhere in their respective motion papers. (*See generally* Mot.; Opp.; Reply.)

As with Padilla's discrimination claim, the allegations of retaliation are no more than "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," which "do not suffice" to state a claim upon which relief can be granted. *Carlin*, 852 F.3d at 212 (quoting *Iqbal*, 556 U.S. at 678). It is unclear whether Padilla took any of the protected actions listed in Section 4311(b), although the Complaint does allege that he contacted the ESGR to initiate a USERRA-based claim and that he repeatedly complained to DOE staff about the pay and benefits issues. (*See, e.g.*, Compl. ¶¶ 21, 27.) However, even assuming that Padilla engaged in protected action, the Complaint "lacks any factual allegations"—even on information and belief—"indicating that [Padilla's] protected conduct was [a] motivating factor" in the denials of pay and benefits. *Hunt*, 2011 WL 651876, at *5. Thus, Padilla's "conclusory allegations that various employment actions taken against him violated USERRA [are] insufficient to state a claim" because he provides "no supporting facts upon which it could plausibly be inferred that . . . any protected activity was a substantial or motivating factor in the adverse employment actions." *Hunt*, 476 F. App'x at 891. The USERRA retaliation claim is dismissed.

### 3.    Section 4312(a) and (b)

Finally, USERRA "Section 4312 provides that any person whose absence from a position of employment is necessitated by service in the uniformed services is entitled to reemployment rights" if, among other things, the employee provides advance written or verbal notice to their employer. *Warren*, 358 F. Supp. 2d at 310; *see also* 38 U.S.C. § 4312(a)(1). Advance notice is not required, however, "if the giving of such notice is precluded by military necessity or, under all of the relevant circumstances, the giving of such notice is otherwise impossible or unreasonable." 38 U.S.C. § 4312(b)(1); *see also id.* § 4312(b)(2) (listing instances

in which a determination of military necessity "shall" be made for purposes of § 4312(b)(1)).

Although Padilla "identified a discrepancy with his teaching assignment" upon his return from his first deployment, he concedes that all issues pertaining to his first deployment were "resolved." (Compl. ¶¶ 27, 29; Mot. at 3, 8, 13.) Thus, the Complaint does not actually allege that the DOE denied Padilla his reemployment rights after his first or second deployments. As a result, the Complaint fails to state a claim under Section 4312(a), and the USERRA reemployment claim is dismissed.

### C.   Leave to Amend

Padilla requests that the court grant him leave to amend the Complaint in the event that the court grants the DOE's motion to dismiss. (Zeitz Affirmation ¶¶ 7, 16.) The DOE contends that Padilla's proposed amendments would be futile. (Reply at 6-7.)

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "leave to amend a complaint need not be granted when amendment would be futile." *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003). "An amendment is considered futile if it could not defeat a motion to dismiss for failure to state a claim or for lack of subject matter jurisdiction." *Huang v. iTV Media, Inc.*, 13 F. Supp. 3d 246, 264 (E.D.N.Y. 2014) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)). Ultimately, "[t]he decision to grant or deny leave to amend rests within the discretion of the trial court." *N. Assurance Co. of Am. v. Square D Co.*, 201 F.3d 84, 87 (2d Cir. 2000).

The court cannot conclude that amendment would be futile in these circumstances. Counsel for Padilla represents that he has "emails and documentation directly citing [Padilla's] military service as the reason for [the denials of pay and benefits]." (Zeitz

Affirmation ¶ 14.) Such emails and documentation, if summarized within or appended to an amended complaint, might render Padilla's allegations of discrimination on the basis of his military status plausible. As such, the court grants Padilla's request for leave to file an amended complaint. Padilla is warned, however, that the court will not grant further leave to amend "unless [he] provide[s] a detailed indication of what facts [he] would add to cure the pleading's defects . . . with an explanation of why the amendment would not be futile." *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 309 (S.D.N.Y. 2019); *see also F5 Cap. v. Pappas*, 856 F.3d 61, 90 (2d Cir. 2017) (leave to amend properly denied where plaintiff failed to "explain how it proposed to amend the complaint to cure its defects"); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (leave to amend properly denied where the request gives no clue as to how the complaint's defects would be cured").

## IV. CONCLUSION

For the foregoing reasons, the DOE's motion to dismiss is GRANTED without prejudice to the filing of an amended complaint. Padilla shall file his amended complaint within 30 days of the issuance of this opinion. Failure to file an amended complaint within the specified time period will result in the court entering an order dismissing this case with prejudice.

SO ORDERED.

Dated:    Brooklyn, New York
          May 16, 2025

                              s/Nicholas G. Garaufis

                              NICHOLAS G. GARAUFIS
                              United States District Judge

25